**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

   Plaintiff,

vs.

ANGEL AMAYA,

   Defendant.

No. CR 11-4065-MWB

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO SUPPRESS GPS SYSTEM**

---

**TABLE OF CONTENTS**

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A.  *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.  *Factual Background*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.  ANALYSIS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    A.  *Fourth Amendment Violation*  . . . . . . . . . . . . . . . . . . . . . . 10
        1.    *Binding appellate precedent* . . . . . . . . . . . . . . . . . . 12
        2.    *Reliance on binding appellate precedent* . . . . . . . . . . . . . 18
    B.  *Discovery Violation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

III.  CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**I.  INTRODUCTION**

  This case boasts an unusual and endlessly surprising history—one that includes two mistrials and intervening United States Supreme Court authority on the use of GPS devices. Before me now is defendant Angel Amaya's Motion To Suppress GPS System (docket no. 299), in which he moves to suppress evidence derived from the installation and

use of GPS devices, without a warrant, on all vehicles in which he had an expectation of privacy.

## A.  *Procedural Background*

On July 28, 2011, a Superceding Indictment was returned against defendant Angel Amaya and five co-defendants, charging them with conspiracy to possess with intent to distribute 50 grams or more of pure methamphetamine or 500 grams of methamphetamine, 5 kilograms or more of cocaine, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846. In addition, the Superceding Indictment charges defendant Amaya and three co-defendants with conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(1)(B)(ii), and 1956(h).[1] On October 12, 2011, the first day of the trial of defendant Angel Amaya and his co-defendant Javier Amaya,[2] I granted a mistrial after the prosecution's first witness, Special Agent David Jensen, referred to material barred by a sealed motion in limine ruling. That mistrial was the result of a docketing snafu—the prosecutor did not receive the sealed motion in limine ruling prior to the trial and, thus, did not inform his witnesses of this court's restrictions on evidence in this case.[3]

----

[1] On May 18, 2011, the original Indictment in this case was returned against defendant Angel Amaya and three co-defendants, charging them with conspiracy to possess with intent to distribute 50 grams or more of pure methamphetamine or 500 grams of methamphetamine, 5 kilograms or more of cocaine, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846.

[2] The other co-defendants have pleaded guilty.

[3] Nonetheless, the prosecutor, a highly skilled Assistant United States Attorney who has appeared before me for many years and in many trials, knows that I have never begun a trial without filing a written ruling on any pending motions in limine. Having not

(continued...)

On December 19, 2011, the first day of our second attempt to try this case, defense counsel informed me that the prosecution's discovery file did not include any information regarding the use of GPS devices to collect evidence in this case. Defense counsel reported that they had only become aware of the use of a GPS device on defendant Angel Amaya's vehicle through the testimony of the government's first witness, Special Agent Jensen. The defendants then orally moved for a mistrial, which the prosecution opposed. I granted the defendants' motion for mistrial. The defendants then orally moved to dismiss the case with prejudice. After receiving briefing from the parties, I denied the defendants' motion for mistrial with prejudice on January 26, 2012, after finding that there was no evidence that the prosecution "intended to 'goad' the defendant[s] into moving for a mistrial." *See Oregon v. Kennedy*, 456 U.S. 667, 676 (1982).

On January 23, 2012, the United States Supreme Court delivered its opinion in *United States v. Jones*, 132 S. Ct. 945 (2012), in which it held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" *Id.* at 949 (footnote omitted). Accordingly, on January 31, 2012, I invited defendant Angel Amaya and his co-defendant Javier Amaya to file motions to suppress GPS-derived evidence based on *Jones*.[4] On February 9, 2012, defendant Angel Amaya filed his Motion To Suppress GPS System (docket no. 299), in

---

[3](...continued)
received a ruling before the trial, the prosecutor should have inquired, during the pre-trial conference (the opportunity for the parties to bring up any last-minute issues), about the status of the motion in limine. I had filed the ruling on CM/ECF in advance of trial and had no way of knowing, without the prosecutor telling me, that the sealed ruling, which was emailed by the clerk's office, rather than posted publicly on the docket, never arrived in the prosecutor's inbox.

[4] Defendant Javier Amaya did not file a motion to suppress.

which he moves to suppress all information and evidence seized as a result of law enforcement's installation and use, without a warrant, of GPS tracking devices on vehicles in which he had an expectation of privacy. The Government filed its Resistance (docket no. 300) on February 15, 2012. Amaya[5] submitted his reply (docket no. 303) on February 22, 2012. I held an evidentiary hearing (docket no. 313, Minute Entry) on Amaya's suppression motion on March 5, 2012, in which Special Agent Jensen, the case agent, testified, and Amaya offered into evidence several DEA reports regarding surveillance in this case. At the hearing, I requested supplemental briefing on whether the good faith exception applies in this case and whether sanctions should be imposed for the prosecution's failure to provide notice in discovery that law enforcement had used GPS surveillance. The prosecution filed its supplemental brief (docket no. 320) on March 14, 2012, and Amaya submitted his supplemental response (docket no. 332) on March 26, 2012.

### B.  Factual Background

Law enforcement agents used GPS devices on nine vehicles while investigating this multi-defendant case. Originally, Amaya moved to suppress evidence derived from GPS installation and use on the black GMC Yukon, the grey Dodge Ram truck, the black Nissan Maxima, and any other vehicles in which Amaya had an expectation of privacy. However, at the suppression hearing, the parties agreed that the vehicles at issue are Amaya's black GMC Yukon; a black Nissan Maxima registered to another individual but used by Amaya; and his sister's blue Nissan Murano, during the time that Amaya borrowed it and drove it to Texas. The parties agreed that Amaya had an expectation of

---

[5] For the remainder of this opinion, I use "Amaya" to refer exclusively to defendant Angel Amaya.

privacy in these vehicles,[6] and the prosecution indicated that evidence derived from the use of GPS on these vehicles may be used in the prosecution's case against Amaya.[7]

The agents did not have a warrant to use GPS devices to monitor Amaya. All devices ran on battery power and were affixed to the outside of the vehicles. The agents switched the devices on and off remotely and would switch the devices off when not in use to conserve battery life. When switched on, the GPS devices were set to ping at fifteen second intervals, and the location of the vehicle would be transmitted to a website where agents could then access the location information. Special Agent Jensen testified that agents used GPS devices in their investigation, as follows:

> Q: What was the purposes of the trackers in this investigation?
> A: To aid in surveillance. If the vehicle we were following went into a remote area or we felt our vehicles were being seen too many times by the occupants or if we lost the vehicle at a traffic light, I would send out a signal to the tracker to send me a report of its location. Once we caught up with the vehicle, we would turn the tracker off and let surveillance take its course.

Suppression Hearing Transcript (H.Tr.) at 14 (docket no. 330).

Agents first used GPS in this case on March 18, 2011, when they attached a GPS device to Amaya's black GMC Yukon, his primary vehicle, while it was sitting in the driveway of his residence, with the end of the vehicle hanging over the sidewalk. The

_____

[6] The parties disagree, however, as to when Amaya's expectation of privacy in the Nissan Maxima terminated.

[7] The parties also agree that Amaya had an expectation of privacy in his white/grey Dodge Ram truck. However, the prosecution indicates that the GPS device on the Dodge Ram yielded no evidence that the prosecution will use in its case against Amaya. Therefore, because there is no evidence to suppress deriving from the GPS on the Dodge Ram, I do not consider it.

driveway was short, such that a longer vehicle could not park on it without its end hanging over the sidewalk. There were no fences or gates around the driveway and no bushes to obscure the view of the driveway from the sidewalk or street. Before initially applying the device, agents learned that a state trooper had stopped Amaya, while driving a pickup on I-29, after the trooper received a call that Amaya's vehicle was traveling at a high rate of speed and that the occupants were smoking marijuana. During the stop, Amaya reported that he was traveling to a Wells Fargo Bank in Omaha to transfer money to an individual named "Evie." Agents identified "Evie" as Everardo Ramirez in Turlock, California, who they subsequently determined to be Amaya's source of marijuana. Special Agent Jensen testified that, based on his experience, it would be "very probable" that an individual involved in drug trafficking would use his primary vehicle for drug trafficking. H.Tr. at 11. After initially applying the device to the Yukon, agents either changed the batteries on the device or switched out the old device with a new one on four occasions: three times while it was sitting in the driveway with the rear end hanging over the sidewalk, and once while the vehicle was in the Best Buy parking lot. As to how the GPS device on the Yukon led to evidence that the prosecution will use at trial, Special Agent Jensen testified that, on April 29, 2011, after wire intercepts indicated that Amaya intended to transfer money at a Wells Fargo bank, Jensen pinged the GPS and determined the Yukon was located at the Wells Fargo branch on South St. Aubin. The GPS device was removed from the Yukon on May 6, 2011.

Agents applied a GPS device to the black Nissan Maxima on April 12, 2011, while the vehicle was sitting in Amaya's driveway with the end hanging over the sidewalk. Before the GPS was applied, agents "received telephone wire intercepts indicating that what we suspected to be a large amount of cash was going to be concealed in the vehicle and that it was going to be put on a car carrier and sent to California." H.Tr. at 16.

6

While the Maxima was sitting in the driveway, agents turned the GPS on twice to test it to ensure it was working. On April 30, 2011, Amaya delivered the car to a former Wal-Mart parking lot, where it was loaded onto a tractor trailer car carrier. After Amaya departed, agents made contact with the truck driver and requested that he drive the truck to a location in South Sioux City, Nebraska, where agents searched the Maxima[8] and seized approximately $29,200 in cash. At that point, agents changed the battery on the GPS device and sent the tractor trailer, with the Maxima, on its way to California. Agents

---

[8] Amaya appears to challenge evidence relating to the Maxima both on the grounds that a GPS device was used to locate the Maxima and because the Maxima was searched without a warrant, as he mentions in his reply brief that "[n]o warrant existed for the search of the vehicle . . . ." (docket no. 303 at 3) and in his supplemental response brief that "[n]othing in this response waives defense arguments that the DEA agents commandeering a car loaded on a semi truck to another state to search the car without a search warrant is not an invasion of Defendant's rights of privacy." Docket no. 332 at 8. While I will consider Amaya's argument that evidence relating to the Maxima should be excluded because it was derived from a GPS device, I will not consider his argument regarding the warrantless search of the Maxima because it is waived.

First, Amaya waived his argument regarding the warrantless search of the Maxima by failing to include it in his opening brief. *See, e.g.*, *Armstrong v. Am. Pallet Leasing, Inc.*, 678 F. Supp. 2d 827, 872 n. 19 (N.D. Iowa 2009) (noting that inclusion of a new argument in a reply is contrary to N.D. IA. L.R. 7.1(g) and practice in this circuit, citing cases). Second, although Amaya did not know until after our second mistrial that a GPS device was used to locate the Maxima, he was on notice before trial that the Maxima, while on the car carrier, was searched, as photos of the Maxima on the car carrier and of the seized money were prosecution exhibits at trial. *See* Prosecution Exhibits 26e-26g. Amaya has never claimed that he was unaware before trial that agents searched the Maxima without a warrant. The fact that a GPS device may have been used to locate the Maxima (a fact Amaya did not know until after our second mistrial) changes nothing about what Amaya already knew about the search of the Maxima. The trial management order sets the deadline for motions to suppress at 28 days after the date of the defendant's first arraignment. Any argument Amaya now makes regarding the warrantless search of the Maxima is untimely, and I will not consider it.

turned the GPS on and tracked it as the Maxima traveled to California. Agents removed the GPS device from the vehicle on or about August 10, 2011, in California.

Agents attached a GPS device to the blue Nissan Murano on April 5, 2011, during a traffic stop of the Murano in Kansas while Amaya was driving the vehicle to Texas. Before attaching the GPS to the vehicle, agents "intercepted telephone calls that indicated this was going to be a quick trip to Texas and that it was secretive in which Angel Amaya told Jesus Lopez to make sure you don't tell anybody that we're going to Texas and he said that he didn't." H.Tr. at 19. Agents checked the GPS periodically throughout the Murano's trip to Texas, and agents used the location data from the GPS to make a traffic stop of the Murano. No evidence was seized as a result of the traffic stop. There is no indication in the record that the battery or the GPS itself was ever replaced while Amaya used the Murano. The prosecution indicated at the suppression hearing that it may use evidence regarding the Murano at trial but did not specify how. The device was removed on May 12, 2011.

The discovery file did not mention the use of GPS devices in investigating Amaya. Agents applied for a Title III (T3) wire tap on March 11, 2011, and indicated in the supporting affidavit that they had attempted to use GPS devices prior to March 11, 2011, but had been unsuccessful due to the location of target vehicles. The prosecution failed to include this affidavit in the discovery file. In the suppression hearing, the prosecutor explained this failure, as follows:

> THE COURT: . . . . Was the failure to disclose GPS tracking in the discovery file a violation of the discovery order or your duties in discovery?
> MR. KNIEF: It may have been by the omission of the T3 affidavit, and I think that was. I mean, that should have been in the discovery file, and it wasn't.

> THE COURT: And I just want to make sure, see if we're on the same page here. The reason why is –– well, what's the reason why in your view?
>
> MR. KNIEF: As –– going back through the process, we do not do a lot of T3s in our office. And it was substantially different and st –– substantially different than an ordinary order for a number of things which were in the discovery file. The search warrants were in the discovery file. The orders of the court regarding the trap and traces that led up to the T3 were all in the discovery file.
>
> This came through. It looked different. It was placed in the case file where a lot of these things are placed and not in the discovery file. And I –– and it was placed in the wrong file.

H.Tr. at 59-60.

Additionally, Special Agent Jensen, in the reports that Amaya *did* receive in discovery, never indicated that the agents had used GPS surveillance. He used the phrase "surveillance showed," to refer to GPS surveillance, H.Tr. at 24, "I observed" to refer to pole-camera surveillance, H.Tr. at 25, and "Agent or TFO observed" to refer to visual surveillance, H.Tr. at 26. Special Agent Jensen testified that he did not refer specifically to "GPS" "[b]ecause at the time I felt I was safeguarding a sensitive investigative technique, and I thought I was following policy." H.Tr. at 27. He also testified that the DEA has a written policy that agents may not disclose details regarding surveillance technologies. I requested a copy of the written policy for *in camera* inspection, which the prosecution provided after the suppression hearing.

## II. ANALYSIS

Amaya argues that evidence derived from the use of GPS devices should be suppressed for two reasons: 1) the use of GPS devices violated the Fourth Amendment;

and 2) the prosecution's failure to disclose the use of GPS devices prior to trial was a discovery violation, and, therefore, at a minimum, the evidence derived from these devices should be suppressed—although he also argues that the charges against him should be dismissed as a sanction. I take each argument in turn.[9]

### A. Fourth Amendment Violation

The United States Supreme Court determined in *Jones* that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" *Jones*, 132 S. Ct. at 949 (footnote omitted). The Court did not reach the issue of whether a warrant is required in order for law enforcement to use GPS, as the Court concluded that the prosecution had waived its argument that, even if the use of GPS constituted a search, the search was reasonable under the Fourth Amendment without a proper warrant because the agents had reasonable

---

[9] Amaya makes passing reference to several additional arguments that I now briefly address. First, he states, but does not explain how, the prosecution's failure to disclose the use of GPS devices was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963). To prove a *Brady* violation, "the defendant must show that the evidence was favorable and material and that the government suppressed the evidence." *United States v. Ellefsen*, 655 F.3d 769, 778 (8th Cir. 2011). The defendant has made no attempt to explain how the prosecution, by failing to disclose the use of GPS devices, suppressed evidence that was "favorable and material" to Amaya. If anything, the evidence obtained through the GPS devices appears to inculpate Amaya. Next, Amaya asserts, but does not explain how, the prosecution violated the Jencks Act. "'The Jencks Act requires that the prosecutor disclose any statement of a witness in the possession of the United States which relates to the subject testified to by the witness on direct examination.'" *United States v. Stroud*, ___ F.3d ___, Nos. 10-3621, 11-2119, 2012 WL 833004, at *7 (8th Cir. 2012) (quoting *United States v. Douglas*, 964 F.2d 738, 741 (8th Cir. 1992) and citing 18 U.S.C. § 3500(b)). The Jencks Act does not appear to be relevant here, as this motion to suppress deals with the use of GPS devices, not with any witness statements.

suspicion, and even probable cause, to believe the defendant was involved in a crime. *See id.* at 954.

Amaya, who has not yet been tried, may properly move to suppress evidence based on *Jones* because it applies retroactively to him: a defendant "may invoke . . . [a] newly announced rule of substantive Fourth Amendment law" until his "conviction . . . become[s] final on direct review." *See Davis v. United States*, 131 S. Ct. 2419, 2431 (2011). As both parties recognize, because *Jones* applies retroactively, the installation and use of GPS devices to monitor Amaya constitute a "search" under the Fourth Amendment.[10] As the prosecution correctly notes, however, *Jones* left open the question of whether a warrant is required for GPS monitoring or if, instead, warrantless GPS monitoring is lawful when officers have reasonable suspicion or probable cause to believe

---

[10] Amaya briefly mentions in his Motion To Suppress GPS System, but not in his supporting brief, that the installation and use of the GPS devices is not only a search, but also a seizure. He states, "The installation of the GPS devise [sic] meaningfully interfered with Defendant's possessory interest in excluding others from exploiting or usurping his vehicle. Further, the GPS devise [sic] is a seizure because it generates and stores data that the government sought to use against the Defendant, in one form or another." Docket no. 299 at 2. He cites no law for these propositions, and *Jones* does not support his argument. In fact, as Justice Alito was careful to note in his concurrence,

> The Court does not contend that there was a seizure. A seizure of property occurs when there is "some meaningful interference with an individual's possessory interests in that property," *United States v. Jacobsen*, 466 U.S. 109, 113 (1984), and here there was none. Indeed, the success of the surveillance technique that the officers employed was dependent on the fact that the GPS did not interfere in any way with the operation of the vehicle, for if any such interference had been detected, the device might have been discovered.

*Jones*, 131 S. Ct. at 958 (Alito, J., concurring).
Therefore, I do not address this undeveloped argument further.

that a vehicle is involved in illegal activity. I find, however, that I need not decide this question to resolve Amaya's motion to suppress. Even assuming that the warrantless use of GPS devices to monitor Amaya violated the Fourth Amendment, the evidence collected from the GPS devices is not subject to the exclusionary rule because, pursuant to *Davis v. United States*, 131 S. Ct. 2419 (2011), the good faith exception applies, as the agents here relied upon binding Eighth Circuit precedent authorizing warrantless GPS surveillance.

*Davis* addressed the issue of whether to apply the sanction of the exclusionary rule "when the police conduct a search in compliance with binding precedent that is later overruled" or if, instead, the good faith exception should apply in such situations. *Id.* at 2423. After reasoning that "suppression would do nothing to deter police misconduct in these circumstances," *id.*, the Court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id.* at 2423-24. Therefore, to determine whether evidence derived from the GPS searches at issue here should be suppressed, I look first to see whether binding appellate precedent regarding the use of GPS devices existed at the time of the searches here and, second, whether the searches were "conducted in objectively reasonable reliance" on that binding appellate precedent.

### 1. Binding appellate precedent

The prosecution directs me to *United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010), in which the Eighth Circuit Court of Appeals held that "when police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time." *Id.* at 610. In response, Amaya argues that *Marquez* is not binding appellate precedent for the following reasons: 1) *Marquez* first ruled that the defendant lacked standing to contest the GPS search of his

vehicle and, therefore, *Marquez*'s subsequent discussion of the lawfulness of GPS devices is dicta and not binding precedent; 2) *Marquez* is not binding appellate precedent because, in stating a warrant is not required for GPS surveillance, it contradicted the holding of *United States v. Knotts*, 460 U.S. 276 (1983), which "reserved the issue of whether twenty-four hour GPS tracking constituted a search for purposes of a Fourth Amendment violation," *see* Defendant's Reply Brief at 5 (docket no. 303); 3) *Marquez* analyzed whether the defendant had an expectation of privacy in his vehicle and "did not discuss the issue of whether the placing of a GPS tracking device on a vehicle constitutes a trespass requiring a warrant for purposes of the Fourth Amendment," *see* Defendant's Reply Brief to Government's Memorandum at 3 (docket no. 332), and, therefore, should not control here because Amaya asserts, based on *Jones*, that agents violated his Fourth Amendment rights by trespassing onto his vehicles.

Amaya's arguments are unavailing. First, *Marquez*'s conclusion as to whether a warrant is required for GPS monitoring is an alternative holding, not dicta. "[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dictum." *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949); *Sutton v. Addressograph-Multigraph Corp.*, 627 F.2d 115, 117 n.2 (8th Cir. 1980) ("When two independent reasons support a decision, neither can be considered obiter dictum, each represents a valid holding of the court." (quoting *Kushner v. Winterthur Swiss Ins. Co.*, 620 F.2d 404, 408 n.4 (3d Cir. 1980))). Amaya is certainly correct that *Marquez* first determined that the defendant did not have standing to object to the GPS monitoring of the vehicle because he was only a passenger. *See Marquez*, 605 F.3d at 609. However, *Marquez* next stated, "Even if Acosta had standing, we would find no error[,]" *see id.*, and proceeded to analyze whether the use of GPS devices to monitor an individual's vehicle violates that individual's expectation of privacy, *see id. Marquez* then concluded,

"[W]hen police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time." *Id.* at 610. The Eighth Circuit Court of Appeals's rejection of Marquez's Fourth Amendment challenge, thus, could rest either on Marquez's lack of standing or the court's determination that a warrant was not required for GPS monitoring.[11] Therefore, because

---

[11] The fact that the Eighth Circuit Court of Appeals first determined that Marquez lacked standing to challenge the GPS search does not, by default, render the remainder of the decision dicta. Although courts continue to "use the term 'standing' as a shorthand reference to the issue of whether defendants' Fourth Amendment interests were implicated by the challenged government actions[,] [t]echnically, the concept of 'standing' has not had a place in Fourth Amendment jurisprudence [] since . . . *Rakas v. Illinois*, 439 U.S. 128 (1978)." *United States v. Green*, 275 F.3d 694, 698 n.3 (8th Cir. 2001) (internal quotation marks omitted); *see also United States v. Sturgis*, 238 F.3d 956, 958 (8th Cir. 2001) (noting Supreme Court's "rejection of 'standing' nomenclature" in context of Fourth Amendment challenges). *Rakas* concluded that the question of whether a defendant may properly raise a Fourth Amendment challenge "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *See Rakas*, 439 U.S. at 140. Thus, a defendant's "standing," for purposes of a Fourth Amendment challenge, is simply a step in the court's substantive analysis, rather than a jurisdictional requirement like constitutional standing. *See United States v. Marchant*, 55 F.3d 509, 512 (10th Cir. 1995) ("The term standing in this context refer[s] to the determination of whether a defendant's Fourth Amendment rights have been violated, and not in its traditional sense as a constitutionally-or prudentially-based jurisdictional bar." (internal quotation marks omitted)). Consequently, although a court's determination that a litigant lacks constitutional standing deprives the court of "the jurisdiction or the power to consider [the merits of a litigant's claims] in any manner whatsoever," *see Starr v. Mandanici*, 152 F.3d 741, 752 (8th Cir. 1998) (Beam, J., concurring), a court's determination, in contrast, that a defendant lacks "standing" to raise a Fourth Amendment challenge, does not serve as a jurisdictional bar to the court's consideration of other substantive facets of the defendant's challenge.

either of the court's articulated grounds would independently support its decision, neither "can be relegated to the category of obiter dictum," and each is a binding alternative holding.[12] *See Woods*, 337 U.S. at 537. Therefore, *Marquez*'s ruling that "when police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time," *see Marquez*, 605 F.3d at 610, was binding appellate precedent in effect at the time agents used GPS devices to monitor Amaya in 2011.

Second, *Marquez* is not at odds with *Knotts*, in which the Court decided that, where law enforcement placed a beeper inside of a chloroform drum and then tracked the beeper as it traveled to the defendant's residence, "monitoring the beeper signals . . . [did not] invade any legitimate expectation of privacy on [the defendant's] part." *See Knotts*, 460 U.S. at 285. Amaya is certainly correct that *Knotts*, decided in 1983, did not reach the issue of whether the surveillance now made possible by GPS violates the Fourth Amendment. The Court, rejecting the defendant's argument that, under the *Knotts* holding, "twenty-four hour surveillance of any citizen of this country will be possible, without judicial knowledge or supervision," *see id.* (internal quotation marks omitted),

---

[12] Although the Eighth Circuit Court of Appeals in *Marquez* did not explicitly state, "In the alternative, we hold," prior to announcing that a warrant was not required to use GPS monitoring, it is not uncommon for the Eighth Circuit Court of Appeals to conclude, first, that a defendant lacks Fourth Amendment standing before finding, in the alternative, that, even if the defendant had standing, no Fourth Amendment violation occurred. Similar to the case at hand, in *United States v. Barragan*, 379 F.3d 524 (8th Cir. 2004), the Eighth Circuit Court of Appeals, in considering a defendant's Fourth Amendment challenge to a search of his vehicle, first determined that the defendant lacked standing and then reasoned, "[i]n the alternative," that the defendant had, in any event, consented to the search. *See id.* at 530.

concluded, "[I]f such dragnet type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable." *See id.* Thus, the *Knotts* Court did not decide the issue of whether twenty-four hour remote surveillance, without a warrant, would violate the Fourth Amendment. Nothing about the Court's reservation of that issue in *Knotts*, however, prevented lower courts from addressing whether the warrantless use of GPS devices violates the Fourth Amendment when cases involving that question arose. Thus, *Marquez*, which decided that the warrantless use of GPS monitoring did not violate the Fourth Amendment, is not contrary to *Knotts* but, instead, simply addressed a question left unanswered by the Supreme Court.

Third, *Marquez*'s ruling concerning GPS monitoring is binding, regardless of the fact that its analysis focused on the defendant's reasonable expectation of privacy and did not discuss the Fourth Amendment's roots in common law trespass. Amaya argues that because his Fourth Amendment challenge, based on *Jones*, is that agents violated his Fourth Amendment rights by trespassing on his vehicle, he "has raised an issue that was not presented in *Marquez*," and, therefore, "the Government claim [that] Agent Jensen was relying of [sic] 'binding precedent' must fail because there was no precedent in the Eighth Circuit on whether the placing of GPS on the vehicle constituted a trespass and thereby requiring a warrant to satisfy the Fourth Amendment." Defendant's Reply Brief To Government's Memorandum at 4 (docket no. 332). Amaya maintains, "Certainly, Agent Jensen and the United States Attorney's Office should have been aware of trespass being tied to Fourth Amendment jurisprudence to have question [sic] the holding in *Marquez*, supra, when *Marquez* was silent on such discussion." *Id.* at 3.

Amaya's argument is unpersuasive. Certainly, law enforcement must learn and abide by the requirements of the Fourth Amendment. *Davis*, 131 S. Ct. at 2429

16

("Responsible law enforcement officers will take care to learn what is required of them under Fourth Amendment precedent and will conform their conduct to these rules." (internal quotation marks omitted)). Nonetheless, at no time have courts ever required law enforcement to analyze and understand the theoretical underpinnings of Fourth Amendment directives, which, as the Supreme Court has made clear, must be practical and straightforward to ensure that law enforcement will follow them. *See United States v. Ventresca*, 380 U.S. 102, 108 (1965) ("[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation." (explaining how courts should evaluate affidavits in support of search warrants)). Here, binding appellate precedent in the Eighth Circuit was that agents, who have reasonable suspicion that a suspect is using a vehicle for drug trafficking, do not need a warrant to use GPS monitoring, for a reasonable amount of time, when they attach the GPS device while the vehicle is in a public place. *See Marquez*, 605 F.3d at 610. Amaya cannot undermine *Marquez*'s binding precedential value by asserting that law enforcement—all of whom, apparently, are intimately familiar with Eighteenth Century property law—should have anticipated the plurality's opinion in *Jones* that GPS monitoring constitutes a search because it is a trespass. *See Jones*, 132 S. Ct. at 949. At heart, Amaya's argument attempts to circumvent *Davis*, which does not require law enforcement to anticipate developments in law that occur after they investigate a suspect, but rather to comply with binding appellate authority in existence at the time of their investigations. *See Davis*, 131 S. Ct. at 2423-24.

Therefore, I conclude that *Marquez* was binding appellate precedent at the time agents used GPS to monitor Amaya.

### 2. Reliance on binding appellate precedent

*Davis* held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *See id.* While *Davis* refers to officers' "reliance on binding appellate precedent," what the Court actually evaluated in *Davis* was not officers' actual knowledge of and subjective reliance on specific binding appellate precedent, but rather whether the officers "acted in strict compliance with binding precedent."[13] *Id.* at 2428. Lower courts, accordingly, when applying *Davis*, have looked to officers' compliance with, not knowledge of, binding appellate precedent. *See, e.g.*, *United States v. Allison*, No. 10-3141, 2011 WL 6089885, at *1 (8th Cir. Dec. 7, 2011); *see also United States v. Osborne*, No. 09-5276, ___ F.3d ___, 2012 WL 716459, at *5 (6th Cir. Mar. 7, 2012); *United States v. McDuffie*, Nos. 09-30307, 09-30370, 2011 WL 5032695, at *1 (9th Cir. Oct. 14, 2011). Thus, here, I analyze whether the agents acted in compliance with *Marquez* when they used GPS devices to monitor Amaya. The prosecution asserts that the agents acted in compliance with *Marquez*, and Amaya offers no argument as to whether the agents complied with *Marquez*.

---

[13] Though I am bound to follow it, I disagree with the Court's equation of reliance on binding appellate precedent with mere compliance. This expansive and overly lenient standard undermines the need for law enforcement to stay current with evolving precedent and rewards them when they happen to guess correctly without actually knowing the law. If I could apply what I view to be the preferred standard—knowledge of and reliance on, rather than compliance with, specific appellate precedent—the prosecution's argument would fail, as it presented no evidence that Special Agent Jensen and his colleagues were specifically aware of *Marquez*.

*Marquez* provides that "when police have reasonable suspicion that a particular vehicle is transporting drugs, a warrant is not required when, while the vehicle is parked in a public place, they install a non-invasive GPS tracking device on it for a reasonable period of time." *See Marquez*, 605 F.3d at 610. Thus, I evaluate whether 1) the agents had reasonable suspicion when they installed GPS devices on each vehicle at issue;[14] 2) the GPS devices were non-invasive; 3) they were installed in a public place; and 4) the GPS devices were used for a reasonable period of time.

First, the agents, when they installed the GPS devices, had reasonable suspicion that the Yukon, Maxima, and Murano were being used for drug trafficking. "An officer's suspicion is reasonable if he 'knows particularized, objective facts that lead to a rational inference that a crime is being or has been committed.'" *United States v. Gannon*, 531 F.3d 657, 661 (8th Cir. 2008) (quoting *United States v. Hernandez-Hernandez*, 327 F.3d 703, 706 (8th Cir. 2003)). To begin, before any GPS monitoring was used, agents secured a Title III wiretap order on March 11, 2011, in which this court determined there was probable cause to believe Amaya was, and would continue to be, involved in drug trafficking. As "[r]easonable suspicion is a lower threshold than probable cause . . . ," *see United States v. Carpenter*, 462 F.3d 981, 986 (8th Cir. 2006), agents certainly also had reasonable suspicion that Amaya was, and would continue to be, involved in drug trafficking. Moreover, Special Agent Jensen's testimony from the suppression hearing demonstrates that the agents had reasonable suspicion that Amaya was using the Yukon,

---

[14] The parties agree that Amaya has standing to raise a Fourth Amendment challenge to the GPS monitoring of the Yukon, the Maxima, and the Murano. I assume for the purposes of this analysis that the parties are correct, as I ultimately find that, in any event, evidence derived from the GPS devices on these vehicles is not subject to the exclusionary rule.

Maxima, and Murano for drug trafficking, as the agents knew particularized, objective facts to support a rational inference that Amaya was using each vehicle for drug trafficking.

Before installing the GPS on the Yukon, Amaya's primary vehicle, on March 18, 2011, the agents learned of Amaya's traffic stop and that he was traveling to Omaha to transfer money to a person they determined to be his marijuana source. Special Agent Jensen testified that, based on his experience, an individual involved with drug trafficking would likely use his primary vehicle for drug trafficking. Therefore, agents had reasonable suspicion that Amaya was using the Yukon for drug trafficking. Before installing the GPS on the Maxima on April 12, 2011, the agents intercepted phone calls indicating that a large amount of cash would be concealed in the Maxima and sent to California, and the agents knew that Amaya's marijuana source was in California. Prior to installing the GPS on the Murano on April 5, 2011, agents had "intercepted telephone calls that indicated this was going to be a quick trip to Texas and that it was secretive in which Angel Amaya told Jesus Lopez to make sure you don't tell anybody that we're going to Texas and he said that he didn't." H.Tr. at 19. This secretive trip in the Murano, coupled with the fact that agents already had probable cause to believe Amaya was engaged in drug trafficking and knew that Amaya was sending money to a marijuana source outside of the state of Iowa, supports reasonable suspicion that Amaya would use the Murano for drug trafficking during his trip to Texas.

Second, the GPS devices used were non-invasive, as they were attached to the outside of the vehicles and ran on their own battery source.

Third, agents installed and serviced the GPS devices on all three vehicles while they were in public places: parked in the front driveway with the end hanging over a public

sidewalk;[15] in a store parking lot; parked on a car carrier after agents pulled over the carrier in South Sioux City, Nebraska; and during a traffic stop on a highway in Kansas.

Fourth and finally, the GPS devices were used for a reasonable period of time. The GPS device in *Marquez* was in place for five months, *see* Brief for United States, Appellee, *United States v. Marquez*, 605 F.3d 604 (8th Cir. 2008), 2009 WL 2955451, a length of time the court deemed reasonable, *see Marquez*, 605 F.3d at 610. Here, the Yukon was monitored for two months, the Maxima four, and the Murano one. Therefore, the agents used GPS monitoring for a reasonable period of time, consistent with *Marquez*.

───────────────

[15] When the agents installed devices on the Yukon and the Maxima, both vehicles were parked in Amaya's driveway with the end over the sidewalk. The record does not indicate where the agents installed the GPS device: that is, whether it was installed on a part of the vehicle hanging over the public sidewalk or on a part of the vehicle located in the driveway. Even if the device was installed on a part of the vehicle in the driveway, however, the result would be the same as if installed over the public sidewalk, as the Eighth Circuit Court of Appeals has explained that individuals have no reasonable expectation of privacy in their front driveways when there are no barriers to access and the driveways are open to public view. *See, e.g.*, *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006) ("[W]e will not extend [the defendant's] expectation of privacy to his driveway, walkway or front door area."); *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984) ("[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways."); *United States v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982) ("[A] driveway and portion of the yard immediately adjacent to the front door of the residence can hardly be considered out of public view."). *But see United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011) (finding that unpaved driveway in the backyard was part of the curtilage). Amaya, therefore, had no reasonable expectation of privacy in his front driveway, which was neither gated nor obstructed from view by any shrubs or trees.

In sum, the agents here strictly complied with the directive of *Marquez* that no warrant is required to use non-invasive GPS monitoring for a reasonable period of time, when agents have reasonable suspicion that a suspect may be using a vehicle for drug trafficking, and the devices are installed while the vehicle is parked in public. Thus, even assuming that the warrantless GPS searches here violated the Fourth Amendment under *Jones*, the exclusionary rule, pursuant to *Davis*, 131 S. Ct. at 2423-24, does not apply.

## B. Discovery Violation

I now address the issue of whether the evidence derived from the GPS devices should, nevertheless, be suppressed—or some other sanction imposed—because the prosecution failed to disclose the use of GPS monitoring. The prosecution previously admitted, in its briefing regarding Amaya's motion for mistrial with prejudice, that its failure to disclose the use of GPS monitoring was a discovery violation. *See* docket no. 291 at 6 ("[T]he mistrial was caused by a pretrial discovery violation . . . ."). In deciding "whether to exclude evidence to sanction a Government discovery violation," I consider "(1) whether the Government acted in bad faith and the reason(s) for delay in production; (2) whether there is any prejudice to the defendant; and (3) whether any lesser sanction is appropriate to secure future Government compliance." *See United States v. Pherigo*, 327 F.3d 690, 694 (8th Cir. 2003).

There were two causes for the prosecution's failure to apprise Amaya of the use of GPS monitoring before trial. First, the prosecution failed to include in discovery the affidavit in support of the Title III wiretap application. The affidavit referred to agents' attempted—though unsuccessful—use of GPS monitoring. This affidavit, if present in the discovery file, would, at least, have given Amaya some notice that GPS monitoring had been involved in his case. The prosecution has indicated that the omission of the affidavit was an inadvertent mistake, and Amaya has given me no reason to doubt the prosecution's

explanation.  Second, Special Agent Jensen did not indicate, in the reports Amaya *did* receive in discovery, that agents had used GPS monitoring.  Rather, he used "surveillance showed" to indicate GPS monitoring.  He testified that "at the time I felt I was safeguarding a sensitive investigative technique, and I thought I was following policy." H.Tr. at 27.  Unlike the prosecution's failure to include the Title III affidavit, Special Agent Jensen's failure to include any reference to GPS monitoring in his reports was an intentional, conscious decision to withhold this information from the defense.  Special Agent Jensen acts as if GPS technology is some state secret, despite the reality that nearly every family sedan and teenager's cell phone has GPS capabilities now.  Furthermore, he claims that he did so in order to comply with written DEA policy, but I have reviewed the policy *in camera*, and it clearly contradicts Special Agent Jensen's position.  The policy instructs agents not to reveal any particulars regarding the technology used, but authorizes them to indicate in their reports that they placed an electronic transmitter on a vehicle. Indeed, the policy actually *encourages* such practice to avoid the possibility that defense counsel will suggest at trial that the prosecution has hidden evidence from the defense—tellingly, this is the precise situation that arose here!  Because Special Agent Jensen's concealment of GPS monitoring was actually at odds with the policy he purported to follow, I find that he acted in bad faith in failing to disclose the use of GPS devices to Amaya.  No reasonable DEA agent, or anyone else, could possibly read the DEA policy the way in which Special Agent Jensen claims that he did.

Nonetheless, I find that any prejudice to Amaya has, for the most part, been remedied.  The prosecution's failure to disclose the use of GPS deprived Amaya of the opportunity, in advance of trial, to investigate and mount his defense to the GPS monitoring and to file a motion to suppress GPS-derived evidence.  I granted a mistrial to give Amaya the opportunity to access and investigate any information that should have

been contained in the discovery file.  I also invited him to file a motion to suppress GPS-derived evidence, which he has done.  Amaya maintains that the prosecution has continued to engage in discovery violations by providing only vague reports that do not specify all the instances in which agents used GPS to monitor Amaya.  Amaya is correct that the reports are vague, but I granted his request for an evidentiary hearing on the motion to suppress to give him the opportunity to investigate details of the GPS monitoring and to cross-examine Special Agent Jensen, which he has now done.  As to Amaya's argument that he has suffered prejudice from the delay, stress, and added expense caused by the prosecution's failure to disclose, I find that any prejudice, while unfortunate, is modest.

Thus, although I am convinced that Special Agent Jensen acted in bad faith, the prejudice to Amaya has largely been remedied.  Furthermore, the prosecution indicates that, since the suppression hearing, the local drug task force has modified its policies regarding references to GPS monitoring in reports, in order to address the problem that arose here.  Therefore, I do not impose the extreme sanction of suppressing any evidence derived from the use of GPS devices.  However, I am troubled by Special Agent Jensen's actions here.  Given that he acted in bad faith and caused a second mistrial, I am unwilling to let these actions pass without consequences for the prosecution.  Thus, I set a hearing on sanctions for Friday, April 20, 2012, at 1:30 p.m., during which the parties may present arguments as to whether a sanction less severe than evidence suppression, such as taking away the prosecution's peremptory strikes and/or closing rebuttal argument, is appropriate to punish the prosecution for its discovery violation.  Counsel for Javier Amaya is invited to participate, but his presence is not required.

### III.  CONCLUSION

THEREFORE, Angel Amaya's Motion To Suppress GPS System (docket no. 299) is **denied**.  Trial will be reset by separate order.  **A hearing on sanctions is set for Friday, April 20, 2012, at 1:30 p.m.**, in the third floor courtroom in Sioux City, Iowa, during which the parties may present arguments as to whether a sanction less severe than evidence suppression, such as taking away the prosecution's peremptory strikes and/or rebuttal closing argument, is appropriate to punish the prosecution for its discovery violation.  Counsel for Javier Amaya is invited to participate, but his presence is not required.

**IT IS SO ORDERED.**

**DATED** this 10th day of April, 2012.

_Mark W. Bennett_
_____
MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA